THE BUFFALO DOCK COMPANY, Respondent, *v.* ADOLPH LADENBURG and Others, Appellants.

*Dock owner, charging for the receipt and reshipment of merchandise — when entitled, after notice, to charge for its storage.*

The owner of a dock, whose principal business is the receipt and reshipment of iron ore, and whose compensation is based on the labor attendant thereon — the storage being merely an incidental matter — when out of a total delivery of some 30,000 tons of ore, there remains upon his dock, after the expiration of eighteen months, over 15,000 tons, is entitled, after giving reasonable notice to the owners of the ore, that, unless it be removed by a certain date, storage will be charged thereon, to a lien for storage at reasonable rates, after the date named.

APPEAL by the defendants, Adolph Ladenburg and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Erie on the 19th day of September, 1896, upon the decision of the court rendered after a trial at the Erie Special Term.

*Adelbert Moot,* for the appellants.

*John G. Milburn,* for the respondent.

Judgment affirmed, with costs, on opinion of SPRING, J., delivered at Special Term.

All concurred.

The following is the opinion of SPRING, J. :

SPRING, J.:

Corrigan, Ives & Co. in 1891 and thereafter were shippers and vendors of iron ore with their principal place of business at Cleve-

land, Ohio. · This ore was taken from the mines .in the Lake Superior region and shipped by boat to the various lake ports, and in the main transshipped by rail to the purchasers or consumers. The plaintiff was the owner of a dock in the city of Buffalo, and the ore received by it was either immediately transferred from the boats to the cars or was stored to await the convenience of the shippers. The compensation to the plaintiff consisted of from twelve to sixteen cents per ton paid for unloading from the boats, and about twenty cents per ton for loading on board the cars. The storage of the ore on its dock was a mere incident to the traffic, and in the regular order of business was not accompanied with any specific recompense, as the storage was necessary for the proper carrying on of the business of transshipment.

May 29, 1891, the plaintiff received a letter from Corrigan, Ives & Co., stating they desired to place on the dock of the plaintiff 20,000 tons of ore. In reply to this, the plaintiff, in a letter under date of May 29, 1891, informed these defendants it was willing to receive the ore, but should expect shipping orders for two-thirds of it directly from the boats to the cars, and the remaining one-third would be stored without charge until the opening of navigation in the spring of 1892, when a charge at the rate of fifteen cents per ton per year would be made, and also a like toll for any excess of one-third stored during the season. The defendants promptly declined to accept these terms, which they characterized as " very stringent and arbitrary," and the negotiations were dropped, and the ore was not shipped. Mr. Hart was the president and a large stockholder of the plaintiff, but gave no personal attention to the details of the business. He was a buyer of ore, residing in Philadelphia, and has since died. Mr. Corrigan testified he had a conversation with Mr. Hart in which Mr. Hart said in substance that no charge would be made for the storage of the ore at plaintiff's dock, but that the same rules which were in vogue at other Lake Erie ports would control in its dealings with Corrigan, Ives & Co. It is a strong circumstance urged in discredit of this testimony that, during the correspondence relative to the right of plaintiff to charge for storage, no allusion is made by the defendants to this important conversation, if relied upon by the defendants to relieve them from liability, although Mr. Corrigan seems to have been cognizant

of this controversy. In any event, Corrigan, Ives & Co. commenced shipping the ore to the dock of the plaintiff in September, 1891, and before the close of lake navigation had unloaded 16,597 tons, and in the year 1892, 13,784 tons, in all 30,381 tons. During the years 1891 and 1892 there were loaded on the cars from this quantity 14,922 tons and 1,420 pounds, leaving still piled on the dock over 15,458 tons, or more than half of that received by plaintiff.

There are certain facts connected with the shipment of this ore and of the general custom in the business that do not admit of any serious conflict. In the first place neither party expected any charge to be made for the storage of this ore. It was not received by the plaintiff on the basis of its letter of May 29, 1891. That is not the ground of its present demand. No contract was made for any charge and it is not now contended any contractual right existed growing out of that letter, or in the original expectation of the parties that any claim would be made against Corrigan, Ives & Co. for the storage of this ore. But there are certain other propositions to my mind measurably controlling in this case. It is patent it was the intention of all parties to have the transshipment of the ore follow reasonably close its unloading on the plaintiff's dock. That dock was not designed for permanent storage of ore. If so, the basis of all charges, would have been for storage of the ore instead of for its transshipment — for the labor of handling. The dock was a necessity for the temporary piling of the ore, to give an opportunity to the shippers to find purchasers in case none were had when the ore was unloaded. But it was not designed or expected that the bulk of the ore received by the plaintiff would remain piled on its dock during the season or seasons following its receipt. That would make the storage of the ore the principal business of the plaintiff, and the transshipment the incident. Nor does the testimony of the witnesses familiar with the manner of doing this business aid the defendants as to this contention. They agree that the greater per cent of the ore received at their several docks was transferred directly from the boats to the cars, and the great bulk of that stored was removed before navigation opened in the spring following; so that but little was left over for the ensuing summer, and even then the docks as a rule have been owned or operated in the interest of the railroad company whose cars transported the ore. That is, the stor-

age again was merely auxiliary to the chief business of transship-ping. While witnesses testified ore has remained on the docks for several years and without charge being made, it was a small per centum of that originally received by the dock owners. No wit-ness testified that ore had been received by the wharf or dock and piled there and allowed to remain without charge where the storage seems to have been the chief purpose to which the dock had been appropriated. Here we have an anomalous condition of things. Thirty thousand tons are unloaded by a corporation receiving pay exclusively as transshippers. At the end of a year and a half more than one-half of that ore still remained piled on the dock. That was not within the contemplation of the parties. Neither party expected any such issue of their dealings as that. Their contract or arrangement, whatever it was, was not made, nor their business commenced, with reference to any such contingency as that pre-sented by the continued occupancy of the dock space by this ore.

As I have stated, the letters passing between the parties in May, 1891, are not important in determining the contract or method of carrying on the business, but they are cogent and significant in one or two other respects. They do imply it was the expectation that the greater part of the ore received would be immediately transferred from the boats to the cars, and that a charge for storage in certain instances and under certain conditions was not without some basis and some merit. That correspondence makes still more pointed the fact that the plaintiff was not storing ore as a business, but was trans-shipping it. These facts, therefore, may be held to be established :

1. It was not expected that any charge would be made for storage at the inception of the business between the parties.

2. It was expected that the transshipment of the ore would either be made directly from the boats to the cars, or else it would be sub-stantially cleaned up by the opening of navigation succeeding its storage.

3. That the primary business of the plaintiff was to reship the ore, and its compensation was based upon that, upon the physical labor of handling the ore, and it was not a storer of ore, except as an auxiliary to its main business.

It is very obvious, with these facts for a foundation, that the tes-timony as to the custom under widely variant circumstances fur-

nishes no rule to guide us in ascertaining the rights of the parties. With this ore taking up its valuable dock space, and knowing such a prolonged use was not within the original design of the parties, the plaintiff, in March, 1893, notified the shippers that the ore must be removed before June first or a storage charge of three cents per ton per month would be imposed after that date. In so doing the plaintiff did not infringe on any principle inherent in the original understanding, for the condition then existing, as I have stated, was not provided for or foreseen. This new situation confronting the plaintiff, justified measures for the removal of the ore or the imposition of a charge in case it remained after reasonable notice to remove. It is not reasonable to suppose the plaintiff was powerless to act under the changed circumstances. If the contention of the defendants is correct then the plaintiff could never make any charge unless, perhaps, the defendants were grossly negligent. The situation must receive a fair construction. The defendants could not be made liable summarily. It was incumbent upon the plaintiff to give fair notice of its intention to charge, and upon that being done the right to exact it followed. The plaintiff's entire dock space might have been appropriated for years, to the exclusion of any business whatever, if the position contended for on behalf of defendants is correct, and still without any remuneration. Such a rule is too drastic and unreasonable to be sanctioned by a court of equity. While the case is not free from doubt, I am of the opinion that the omission of the defendants to remove the ore within the time designated made them liable for storage charges. The time given seems to have been reasonable. It was some time after the opening of navigation, so that the plaintiff could use its dock space while ore was arriving.

This is a suit in equity to establish a lien upon the ore for the storage charges alleged to be due the plaintiff. The defendants' counsel urge, with much persistence, that in no event is the ore subject to a lien in favor of the plaintiff. That no lien exists by statute is conceded and that there is none by express agreement; and it is also insisted that, in order to make the common-law lien attach, its vitality and force must be operative from the date of the delivery of the goods. There was no lien perforce the commencement of the receipt of the ore, for its continued storage was not anticipated, and hence no storage charges were contemplated. The failure of

defendants to remove the ore, after reasonable notice, gave rise to a new condition of affairs; and when the plaintiff, on March sixth, notified the defendants that a storage charge would be imposed in case the ore was not removed by June first, its relation to the ore and to the defendants changed after the designated period. It then became a wharfinger or bailee, for hire. If it was correct in its position, it had a right to charge for storage after June first; then upon that date there was the inception of a new relation, in effect a redelivery of the ore to it. The lien was not effective from the first shipment of the ore, for liability for payment did not commence then. The beginning of the charge and of the attaching of the lien were simultaneous events. The plaintiff asserted its right to charge for storing the ore. The defendants disputed this. The question of the indebtedness hinged on the result of this controversy and on the same pivot revolved the subsidiary proposition, the right of lien.

If the notice to remove was reasonable in point of time, if plaintiff was within the compass of its rights in imposing the storage charges after June first, then, as a wharfinger or bailee for hire, it was entitled to enforce a lien upon the ore for its fair charges. (*Hartley* v. *Hitchcock*, 1 Starkie, 408.)

As Story says in his work on Bailments, section 452 : " A wharfinger, like other depositaries for hire, has a lien on the goods for his wharfage."

Again in section 435 : " * * * it has recently been held in America that warehousemen have a specific lien, although they certainly cannot be said by their care and skill to have improved the thing bailed. The same would seem to belong to a wharfinger." (See 2 Kent's Comm. 634 *et seq.*; Edw. on Bail. § 364.)

The plaintiff's notice to the defendants was that, in case of failure to remove the ore, it would be subjected to a storage charge of three cents per ton per month. The charge it can make is an adequate compensation, and while the testimony of plaintiff's witnesses on that subject is not controverted, I am satisfied the rate mentioned is excessive. In its original letter, preceding the commencement of business, fifteen cents per ton per year is the price given, and I think that is ample compensation.

The defendants, Ladenburg, Thalmann & Co., purchased this ore of the receiver of Corrigan, Ives & Co., with a guaranty that it was

free from lien charges for storage, and the decisions and judgments will protect these purchasers as against their vendors. The complaint is somewhat loosely drawn and fails to state fully the cause of action, but as the case has been tried on the merits it may be amended conformably to the facts established.